of America, numbers 11-3234 and 11-3262. This is Krugman and Phillips. Good morning, Your Honor. I'm with Krugman for Global, and I'd like to reserve five minutes for rebuttal. That's fine. Thank you. What I'd like to do is start with choice of law, because that runs through both the appeal and the cross-appeal. Could we just go back and look at the actual words of the provision here that you've got the reinsurance certificate, and you've got basically two pages, and if you could focus with me on D, the first sentence of D. As a conditioned precedent, and that ties back to, I guess, the preamble in your argument, the company shall promptly, that is P-E-I-C, shall promptly provide the reinsurer, that is your client, now Global, with a definitive statement of loss on any claim or occurrence reported to the company and brought under the certificate, which involves death, serious injury, or lawsuit. Mr. Phillips has brought up that the words, and brought under the certificate, are important. In your yellow brief, beginning on pages 23, I guess all the way to page 30, you're telling us why that's illogical for him to make that argument, and you're telling us why the consequences of that kind of argument on his behalf don't make sense. But somebody needs to tell me what those words do mean as opposed to why they're illogical. Within the general scope of coverage of the certificate, that's exactly what they mean. In other words, they don't have to report everything in the world. They don't have to report, and it can matter more in different cases where there's a non-concurrency, for example. If this were a non-concurrent reinsurance, there could be a situation that was specifically excluded by the reinsurance. There's a nuclear incident exclusion clause. There's actually more there. Your nuclear exclusion clause is much later than this. That's correct. But the point is there are things that can happen that are on the underlying policy that for some reason or another don't happen with respect to the certificate. And that's what Judge Kelly held. And as far as I know, that is what pretty much every court that has dealt with this issue, and there haven't been many of them, but every court that has dealt with the issue and brought under the certificate has said. It means is it within the general scope of coverage here? Because otherwise, for the reasons we set forth in our yellow brief, it would be completely illogical. I want to focus on a word. But the funny thing is what I didn't get from the yellow brief, you're giving a reason now. But in those seven pages, at the bottom of page 23 to page 30, I don't see a reason for why it's there. I understand you're giving good arguments as to why it's illogical and why the consequences don't make sense. But why is it there? When this was drafted sometime before 1980, is there anything out there that's internal to the industry as to when you are in the back room drafting these types of documents? What provisions like this or what words or terms like this actually mean? There has been, over the last 25 years, a great deal of expert testimony and purported expert testimony on issues like that, which is all over the map, which is completely contradictory, and which is basically the result of a lot of retired people, as happens in many industries. I'm not saying that this is atypical, but the answer is there is not, for example, something like there was when ISO did the new occurrence definition and there was all that stuff about what they really meant. There were presentations to an industry. There's nothing like that. What there is, is there is a lot of this in short form. One needs to understand it. But the thing that is very clear here, and Your Honor, Judge Emmer mentioned a word that is extremely important and reported to the company, the test for the condition perceived, the timing test, is promptly after report. Consider me ignorant. What does, and brought under the certificate, add to this sentence? What it adds to the sentence is, if there was an nuclear explosion and there's death and serious injury, and that is reported to the company, they don't have to report because it's clear there's no coverage. There are things in the certificate that may not be covered. There are things in the policy that may not be covered by the certificate. This is within the coverage of the certificate. The reason I go back and ask as to why, was there anything prior to 1980 that explains certain terms, because, for example, in the title insurance context, there's all kinds of internal company memoranda and manuals that say, when you put in this, it covers thus and so. When you use this term, it means X, not Y. In the reinsurance industry, there's nothing. There are things that people, in retrospect, say there were, but it is exactly as I described. There is a lot of arbitration and litigation going on about reinsurance. There are big dollars involved. You guys could draft a lot better forms than this. When I draft them, Your Honor, they are a lot better than this. Okay. Now, the second sentence in D, which a D is a notice provision. That's correct. The second sentence doesn't begin as a conditioned precedent. And it is our position that that is not a conditioned precedent and that that is a distinction, and that is one of the reasons why it is clear in the first sentence that that notice has to be provided at the time. So it's something considered to be important, like death, serious injury, or suits, and suits have already been filed here, I take it. Absolutely. We've got to know right away, otherwise we can't participate in the investigation of this. We can't choose whether to associate. We can't set reserves properly. And those are, by the way, mentioned specifically in the contract and the definition of the definitive statement is the reasons for it. And, again, the point we're making in our reply brief about the logical reasons is it absolutely has to be early. It cannot be a conditioned precedent to payment. It just doesn't make sense. What were the first occurrences here? Well, this is a specific, so the answer could be 97 years ago, but the first reports that I'm aware of that are in the record are 2001, and the first report to global that is in the record is 2008. That's seven years. That's not lumped by any measure. There's no question, I think, in this record. Well, that's the first claims made, right, in 2001? The claims were actually not then made. They were reported occurrences to PPIC. They hadn't reached the USCIS layer. PPIC did a whole bunch of stuff for seven years without telling us and then eventually sent us a notice and later a bill, and when we got the bill, we investigated and said not timely. I'm certain that Pacific would like to have the law of Pennsylvania applied if it did, considering what we said in trustees at the University of Pennsylvania and extending break-in to sophisticated parties. Why should your language about a condescending precedent take you out of the considerations behind those decisions? For two reasons, really, Your Honor. One is break-in is direct insurance, and I absolutely acknowledge they overrode, as a matter of Pennsylvania public policy, an express condition proceeding. There is no case that I'm aware of that does that in reinsurance, and it would be a new public policy decision for Pennsylvania to make. Break-in would be relevant, but it wouldn't be dispositive. This is an express condition proceeding. How is it different? We're both sophisticated parties. We've already said that those rules apply to sophisticated parties. How is reinsurance different? Reinsurance is different because there is a lot more freedom. This is facultative reinsurance. The word facultative, this court has defined correctly. Defined facultative is we have the faculty, the ability to take or reject the risk on whatever terms we choose. This is a proposal. The senior company comes out and says, we'd like to buy some reinsurance, and we say, yay or nay. We negotiate terms. This is our certificate. Everybody else has a different certificate, and that's, as we noted in our brief, that is indirectly that people do have different certificates, and it matters. But the fact is that when you choose specific language, when you're dealing between grownups, that specific language should matter, and that is the law of New York. The law of New York is prejudice is required without the language, but with the language. And I see nothing in Pennsylvania in the reinsurance context that says Pennsylvania wouldn't do that. But sophisticated parties are big boys, or whatever term you want to use. I still don't really understand what the difference is. The difference may be in the level of sophistication. The difference may be in the nature of the market. The difference may simply be that in direct insurance, even with sophisticated parties, what you are dealing with is a much broader sense of public policy. It's insurer to insurer. This is insurer to insurer, and one of the things I also do is coverage work for insurers, and that is a good way to feel beaten up, because courts routinely, and I'm not blaming them, I understand the policy reasons, routinely look for protection for policyholders. The difference between insurance and reinsurance is not just the level of sophistication, which can also apply in insurance, but the lack of need for that form of protection. This really is a matter of grown-ups, where in direct insurance, even with sophisticated parties, you're still dealing with forms, you're dealing with much broader issues. Beyond that, there isn't that much of a difference, but the fact is, the case where it came up, which is in New York, which goes the same way as Brakeman, when there's no express language. So, you know, that's what there is. The one case that really deals with this issue, and there isn't any case on express conditions proceedings. Is that why Hario is distinguishable? The Commonwealth Court case? Yes, that's correct. There's no case that deals with express conditions proceedings. Could you go through the 188-2 analysis of the restatement? I'm glad you brought that up. Let's start off with, you know, we've got place of contracting, place of negotiation, place of performance, location of the subject matter, and the various interests. But let's start off with place of contracting. Place of contracting is, this is New York. It's New York to New York. There was a Minnesota broker involved. This is a preliminary, just for my own edification. When do we look at this? Do we look at it at the time of contracting? The time of contracting and only the time of contracting. And that's true, by the way, even when performance is involved. And it's an important point, which I'd like to come back to, if I can. You can go with that right now. Okay. Section 188 of the restatement, in fact, Section 188 of the restatement says, and it's clear in the commentary, that place of performance, I actually brought it with me, is to be the state where performance is to occur. In other words, it is at the time of contracting where you look to where performance is to occur. And in this court's decision in specialty surfaces, the court said two things. One, where you don't really know where that is, then place of performance doesn't have that much implication. But it also made it very clear, it quoted the portion where it is to occur. And I wanted to add one more thing on place of performance, because in their fourth step brief, the one we didn't get a chance to respond to, they mentioned 193 of the restatement in their main brief, but they really leaned on it in their fourth step brief. And 193 does not apply to reinsurance. There is no location of the insured risk. There is not a case, I checked again this morning, there is not a case that says that it does. There's one case, it's a district court's case 20 years ago, that says that it doesn't, but there is no case that applies 193 to reinsurance. We are in 188 land. Now that's a payment of premiums from Pennsylvania. Wouldn't that implicate important public policy considerations? I'm sorry, but nobody paid from Pennsylvania. No, this is all New York. Can Pacific continue to pay premiums after moving to Pennsylvania? Absolutely not, Your Honor. Everything was done at the end of 1981. Okay. The location of the subject matter of the contract is what? It is, you can look at it in one of two ways. At inception, there's no questions in New York, no matter how you look at it, because the reinsured is there and the underlying risk is principally there, although it's elsewhere. It's PEICs or Pacific Exposure to Buffalo Forge. Could it possibly be Global's exposure to Pacific? That is not the insured risk. That is the other side of the coin. That's what I'm asking. Global's insured risk has to do with who was purchasing the insurance or the reinsurance, and that would be Buffalo, but it had operations elsewhere. And at the time, perhaps, although there's very little actually that says this, at the time, perhaps, PEIC's Buffalo underwriting office. And one of the things I would like to talk about for a second is the fact that they moved. Because really, from a choice of law standpoint, it's all that they've got. It's all that they've got from a choice of law standpoint is that they later moved. Now, if you look at time of contracting, which is what 188 and specialty services say you look at, it doesn't matter. If you look at the Pennsylvania choice of law cases that we cited on the UIM and UM global things, two things about that. First, Pennsylvania has an answer to that question. Moving doesn't matter. New Jersey has a different answer. They're both looking at the restatement, but they come up with different ways. It can happen. And I don't have to tell at least two of you about the Amica decision, because you were both on it, but it's very clear that this court in Amica never touched the district court's determination of Pennsylvania law, choice of law rules. It said, no, it's 1404A. Amica always thought it was a 1404A case. Exactly right. That's what it was. It moved on the court's own motion, so maybe does 1404A apply? Answer, yes. You apply New Jersey choice of law rules. But if you look at these cases, two things. One, the Pennsylvania rule says we win, because moving doesn't matter. Two, even if you look more deeply, and I don't think you need to, but I don't think you should, these were cases where the risk was still running at the time it moved. In Amica, McIver, or whatever it was, decision that this court relied on, it was almost like a new policy had been issued. Judge Van Anderwerpen, to answer your question, there was stuff still happening after the move in those cases. Here, the risk is gone. All we're doing is waiting for the liabilities to come in and waiting for them to happen. And in this case, at least with respect to this issue, the condition precedent is your effect of it. The substantive issue is, let me see if I can explain this right, it's the nature of the issue you look to for purposes of applying your choice of law. That's correct. And in this case, the performance would have been reward. That's what notice was to be provided. That's exactly what this court held in Thomas Smith, Your Honor. That's correct. Let me just maybe go back at the end to where we started at the beginning here. At the outset, I asked you in the first sentence of D, the notice of provision, and brought under the certificate, what does it mean? And you gave an answer. Mr. Phillips is going to give another answer as to what it means. You said that there's nothing out there that really is interpretive within the industry, at least in writing, that you know of, and that perhaps the only people that really testify about this are retired people who come across as experts or try to be experts on these things. Doesn't that make the first sentence of D ambiguous? No, it doesn't, Your Honor. Because when you are looking at potential ambiguity, you are looking at are the two readings reasonable. And for all the reasons we said in our yellow brief, for all the reasons we said as to why it just doesn't make sense, it's not workable, it reads it out of the contract, it's not a reasonable reading. In other words, you can resolve, if you think of it as ambiguous, which we do not, but if you think of it as ambiguous, you can resolve the ambiguity internally from the words of the contract because the reading that they would give it produces results that can't happen, can't make sense, read clauses out of the contract. Thank you very much. We'll get you back to rebuttal. Thank you. Mr. Phillips. Good morning, Your Honors. May I please have a word? Of course. We have music. Maybe we can start. I'm sorry. I apologize. No worries. Maybe we can start where Mr. Krugman left off, which is that within the whole of the contract, it doesn't make sense to read the words that we're having a problem with in the first sentence of D the way you suggest because it makes a number of other provisions of that contract superfluous, such as the association provision, et cetera. Right. I think that, I mean, the truth is the better way to read the first sentence is that it's never been a number was regarded as a notice provision in the first place, and if you interpret it not as a notice provision, but it is the second sentence that, in fact, carries the weight of providing notice, then it's simply a statement that has to be provided. It's both the first and the second sentence. They say that you shall promptly provide notice. That's pretty simple and pretty strong language. Well, promptly, actually, is that to pay promptly after receiving the definitive statement? That's an E. Let's stay with D for a second. The first sentence of D says, as a condition precedent, again, which they say ties back with the preamble, the company shall promptly provide the reinsurer with a definitive statement of loss on any claim or occurrence reported to the company and brought under the certificate, which involves death, serious injury, or lawsuit. But it also has to be brought under the certificate. And, again, the difficulty with that, and I realize I'm jumping here to some extent because I've got a different language, but the reality is it's not just was there evidence of a death or a serious injury and therefore we have to promptly notify. Instead, it's a requirement of notification after it's brought under the certificate. And it's not that it simply relates to the certificate, which is the interpretation my colleague has given to it. It has to be brought under the certificate, which obviously wouldn't happen until I, after an hour later, had been completely exhausted. So even on its own, I think the Second Circuit, and folks in Paraguay have this 100% right, which is that this precise language is inherently ambiguous and that the best you can get out of it is the ability to take it beyond suffrage. I mean, it's just not to stuffify the motion to dismiss or something. The Second Circuit in this case got it 100% right, but in Belfont got it 100% wrong. Exactly. I got it. I got it. I got it by the way. I'm better with age. I'm supposed to get it right. The issue, just on the second sentence for a moment, and I realize it's not a condition precedent, but when did Pacific create a loss reserve equal to 50% of its retention, which I guess equals 500,000? The record specifically that I know of, at least, that reflects that precise time. Obviously, the first notice that Pacific gave to its broker was in 2005, but whether that reflected that they had, in fact, re-established that reserve, I don't think they had at that point. I don't think they were up to 50%. But, again, Global has never asserted that they had a loss reserve. Something happened four and a half years later in October of 2005 to say, okay, we first got notice in April of 2001, but broker, hey, you better let them know. Tell them now. Right. And that wasn't done. We didn't know that. You didn't know it, but something got messed up. Right. So then we've got another, what, two and a half years before you ever did notify them. Well, no, we kept doing notices, actually, on an annual basis to the broker, and eventually the broker submitted a bond in 2008. Right. So, I mean, I think it's important just to put this in perspective. But they're not responsible for the broker, are they? Well, I think the question, I mean, if the court were to vacate and remand on the first issue, then there would be a whole slew of questions about whether there was, in fact, a breach, because the question is, was the 2005 notice adequate under these circumstances? Did the MSI act promptly? Did they waive any of those issues, et cetera? I mean, there would be a whole slew of questions over and above the interpretation of this particular provision that would be before the district court, which is why I would hope this court would say, look, the district judge in Pennsylvania, doing the best that he could in evaluating what choice of law to apply here, decided that a Pennsylvania court would, in fact, apply Pennsylvania law. And then Pennsylvania law, there is no requirement of prejudice, and the other side is forbidden in any argument that there is prejudice, and therefore the court ought to affirm the first round straight out on that basis. And thus Pennsylvania law applies. Because the question of place of performance, and place of performance for these purposes is evaluated by Pennsylvania courts. What are they looking at? What are they worried about? They're worried about the risk to the seat, and the seat in this case is a domiciliary area of Pennsylvania. But when you look at Hammersmith, I thought place of performance in Hammersmith could be one of two things, either where the premiums are received, and that's in, I think, note 13, or the state in which the notice has been provided, and that's at page 234. Yeah, but I think in the reinsurance context... Those have to be New York, right? Yeah, that's correct. I mean, the premiums are received in New York. The premiums are received in New York, only a picture of the benefits is applied to the broker, so even that would be ambiguous. But it seems to me the more appropriate way to think about this problem is still the way the aerial court did, which is the lower court in Pennsylvania, which says, you know, we ought to focus on the seat. And part of the reason we should drive the analysis here is because reinsurance are located all over the country, not all over the world. And if you don't use the seat as a state of state law, you end up with the seat having to face potentially three or four conflicting rules as well, as opposed to a single rule that Pennsylvania would want to show to protect its own seat area. But it seems to me to be a problem, though, with the fact that the law can change because the seat decides to change its location, its residence. Yeah, but that shouldn't be a problem as long as the seat gives notice to the reinsurer to re-insure and protect it under any circumstances. Well, what can the reinsurer do then? If they change residence, if they change their location, and the seat says, wait a second, the law is not favorable to us, we've already paid the premium, we've already bought the insurance, now we've got to apply a different law to it. Well, that doesn't seem fair to the reinsurer. I mean, I think you've got a situation where you thought that the seat had moved to obtain a favorable rule as well. I mean, the idea that a seat would move to Pennsylvania in order to avoid the possibility of a New York non-budgeted standard is clearly not the case. It's certainly true of the contracting promoted by the fact that you would apply the law, the jurisdiction where the seat was located at the time it entered into the insurance contract. That way everybody knows it's either going to be California law, in this case, or New York law, as opposed to it's either going to be New York law or whatever the seat it moves to eventually. It seems to me the way I think about it, and the way Pennsylvania law courts have at least thought about it, is to say, look, our primary concern is the risk that's being insured at this point in time, and therefore, our focus will be on protecting the seat whose domiciled here, regardless of whether the domicile was acquired before or after. And there's the Parker case in the Eastern District of Pennsylvania acknowledges that that's a waste of their interpretation. We've been told that reinsurance is a whole different sphere by counsel from the other side. Why isn't that so? I mean, I don't know of anything that says that reinsurance is in a whole different sphere. I mean, these are, again, sophisticated parties negotiating in a sophisticated way, and that is the report. It's consistently been that outside the, you know, in cases when you're talking about excess coverage, sophisticated parties that you don't apply. You recognize that prejudice ought to be the appropriate rule, and that's the standard of development. Can I ask you a question? My problem paragraph was F, excess of loss. It says the limits of liability of the reinsurer as stated in item 4 of the declarations apply only to the portion of loss settlements. What does that mean? That means that the limit of liability that's identified in part 1 of the declaration only talks about loss and not expenses. It is the language that expressly says that you're looking somewhere else for expenses, and, of course, the place you look for expenses under this agreement ought to be the follow-the-form language, which is in paragraph A. We don't get there if New York law applies, do we? Well, sure, you still have to get there under New York law. Well, under Gulfine, do you? Yeah, Gulfine. Okay, well, yes and no. I mean, the language that Judge Van Ackerman identified, that language didn't appear in Gulfine. So that language is very different, which would seem to me to make a better-than-average argument for establishing the point being that if New York law applies and if you do not need to show prejudice if a condition precedent is not met in order to have coverage, then you don't really get to what is covered. You just don't have coverage. Well, Judge Ambrose, there are two issues in the case. The first one is, do we get adequate mothers? Judge Wolden, our favorite, that there's no prejudice requirement in there. If you vacate and remand on that basis, which I don't think you should, but if you vacate and remand, there are a whole slew of factual issues that need to still be resolved as to whether or not we complied with that part of the agreement and whether they can break their rights under that agreement, which still means that this... And if we ultimately prevail on that, we still have the limit of liability issue still has to be resolved by this court. So to go back to the previous question about what to do with the limit of liability, the language in paragraph F does two things. One, I think it says as plainly as possible exactly how the court ought to analyze this, which is to follow the film. But more fundamentally, it also distinguishes the specifics of the Belafonte decision because there is no comparable language in Belafonte's contract that tracks this particular language. Therefore, there's no reason to assume... I'm a new insurer. Now, you come to me for reinsurance. I'm trying to put a price on this, but I'm going to charge you. How do I get a grip on the costs and expenses and so forth? Isn't that a problem? Well, I think what you do is you look at... Basically, what you do is... for the underlying coverage in the first instance because that will give you a clue as to at least how we value it. And then if you're just paying your own bill without a share of that, then your premium ought to be kind of, you know, tracks pretty closely to whatever we retain and whatever you take off, which is why... I mean, look, the reality of this is we have a $48,000 premium that we got on something that's probably going to cost us $22.5 million. They got a $2,500 premium on something that we think ought to cost them about $2.5 million. These weren't great deals. Nobody in 1980, candidly, would have cut this deal if they'd known what was going to happen if it came down the road. But the question is, now, what do you do under these circumstances? And to me, at least, on the limit of liability issue, which my colleague has spent a whole lot of time on, there's a fundamental methodological question that it seems to me this court has to resolve, and it ought to resolve it exactly the same way the First Circuit did, which is to recognize that follow-the-form is not only the language of the contract, but also the common-sense understanding of how this operates and the way custom and practice has allowed reinsurance to survive on two pages of contracts that cover hundreds of millions of dollars of liability. And if you follow that methodology, then we would say that the limit of liability language ought to be construed narrowly, but when things are construed later on to be a problem for, for example, the nuclear situation, they really do get down and draft very precisely. Well, there's no question about that, but remember, first of all, that our contracts were written in 1980, or maybe even before 1980. Belafonte decided until the 1990s, so we wouldn't have had the benefit of Belafonte. Let's see if we can tie Judge Manaske's and Judge Van Der Korpen's questions together. Judge Manaske talked to you about, in 1980, no one even thought about Pennsylvania. The only time that Pennsylvania even comes into the equation was 19 years later when Pacific moved from California to PA. And then the question, back to Judge Van Der Korpen's question, is let's go through what it takes to have discerned whether it's Pennsylvania or New York law. Let's start off with the place of contracting. That has to be New York in that scenario, right? It could be Minnesota. That's the problem with these factors. But it is not Pennsylvania. It's not Pennsylvania. The place of negotiation. Again, by Minnesota, because the broker just said this is the deal you want to take and not take it. The place of performance, if we follow Hammersmith, where the premiums are received or where a notice has to be given, that has to be New York, doesn't it? Well, the notice was sent from Pennsylvania to New York. But it has to be given to someone in New York. In New York. Location of the subject matter of the contract is wherever Baltimore Fortune Injuries could arise, which could be anywhere, frankly. It seems to me that the reality is there's no obvious answer out of the restatement and the better way to think about it is what would Pennsylvania State Court do under these circumstances? What are the driving interests here? And it seems to me that the best evidence we have from Pennsylvania is that it would want to protect the risks of the citizens who are domiciled in Pennsylvania and therefore, if that's the law, they would apply. And they would be particularly inclined to apply that law in this circumstance where the effect of applying New York's law is to promote a public policy that is frankly inconsistent with the basic public policy of the state of Pennsylvania because New York law turns on hyper-technical freedom of contract principles which I think had swayed maybe a hundred years ago more than they do today whereas the Pennsylvania law says, look, if you haven't been injured by this... But if this case came up in 1998, there's no way you could apply Pennsylvania law, is there? No. Then you have a fight over Minnesota law. Probably a war of fight over Minnesota law. But again, the question is... But the bottom line here is this didn't come up in 1990. It came up when it did and we still have to ask the fundamental question, what would a Pennsylvania court do? And I think this court ought to defer to the district judge who is a Pennsylvania judge and who interprets Pennsylvania law more often than this court does and he picked Pennsylvania law as the appropriate one for these purposes because that was his best guess. And Mr. Krugman did it a long time, and I did it a long time too. I understand some of these judges, but you have a little more room over here. The problem that Mr. Krugman points out, which makes sense, is that there's a lot of things that are in this contract that sophisticated parties, so clearly they've been negotiated for. Maybe some of them with the different reinsurers are different, like one has arbitration, another doesn't. But here they negotiated specifically, or specifically have in the agreement, that they have a right to associate, they have a right to participate. But that was a prejudice judgment. Let's be careful about that. Maybe in some other case that would be an interesting argument to make that we were in fact prejudiced, but they have abandoned that prejudice. But if there is no prejudice, we don't have to get there. The point there is, they're saying, there is a reason that this condition precedent is important to us. And so it's not unreasonable, their position. Well, I'm not saying it's an unreasonable interpretation of the agreement. My view is that this language, as the Second Circuit said in Pope's America, is inherently ambiguous, because, candidly, this is a cut-and-paste job from other contracts. This is not something the parties finally negotiated. The process that was used here is, they sent out the underlying insurance to a broker, and they sent back this document. That certainly makes sense, because the insurance contracts are significantly different in significant areas. Let's go to paragraph 8. It seems to say that Pacific must submit a DSOL before Global will make a lost payment on any claim. If that's true, why would we read the certificate to allow Pacific to submit both a paragraph D DSOL and a paragraph E DSOL at the very same time, namely when you're seeking payment? When I look at that, I cannot figure out an answer to that. I mean, I don't disagree that there's an inherent ambiguity in that, because why would you have two separate notice requirements? You have one that says you provide notice when you have a certain reserve within your system, and another one that says you have to do it based on something that arises under the certificate. I mean, you're asking me to reconcile all these provisions. I can't do it. But, see, the burden of ambiguity falls on Global. This is their contract, and they need to have a reasonable response to that. Their point is that when you go down, there's a logical progression, and that when you get to D, it's here's the things you've got to let us know, and when you get to E, here's the way you have us pay. And they're saying that if you don't comply as a condition precedent to D, it affects coverage, and you're saying, well, it could possibly only affect conceivably payment, but not coverage. But, again, the logical progression of that, you wouldn't have the first sentence followed by the second sentence. You wouldn't have two fundamentally different notice provisions. No, the second sentence is the non-death, non-suit, non-serious injury. It's sort of your run-of-the-mill claim. That makes sense. Right. Well, I mean, you could, in fact, distinguish it on that basis. On the other hand, you could also recognize that the true notice provision is in the second sentence, and that the first sentence just serves a different purpose, that this is not as logical. The logic of this seems to me very difficult to reconcile because you do, in fact, ask for definitive. I mean, it's the same definitive statement of loss. So the idea that you might actually have to provide it exactly at the same time should come as a huge shock, particularly when it has to be brought under this certificate. So that means it's got to be at a time where you have, in fact, incurred losses that would otherwise give you a basis for a claim, which, frankly, may have been around 2005. Again, remember, Judge Ambrose, if you go down this path, all you're doing is, you know, sending it back to the district court for a whole slew of fact findings with respect to how this contract plays out. And I would submit to you, if you're going to do that, then what you ought to do is say that the entirety of the issue is open, including, you know, how do you interpret this and how would this be understood against the backdrop of custom and tradition within the insurance business. If we think that there was... that New York law applies and not Pennsylvania law, why do we have to remand it? Oh, because the question of whether we... you know, was the 2005 notice sufficient? We don't know the answer to that. Did they act appropriately after we provided a notice in 2008? They may have waived it by not doing anything. They didn't do anything with respect to this until the mid-2009. So we would argue... Did the district court decide the waiver issue and didn't it say there was no waiver? No, no. The court said that this is a notice issue, to be sure, but I would submit, frankly, that that's wrong because it's the best antithesis on that. It couldn't have moved on that as a matter of on the pleadings. It shouldn't have allowed... If it's going to go down this path, then we've got to start over and have ultimately a trial on the meaning of this contract. It's only by ruling that Pennsylvania law applies and that the prejudice requirement has to be demonstrated and which they conceded they cannot demonstrate that the court can take that issue off the table. And all that's left, then, is the limit of liability, which, frankly, is the argument for why prejudice will sell. The argument for why prejudice should apply is a good one, but that's not New York law. Right, and I would hope this court recognizes, Judge Keller did, that the right that the Pennsylvania court would do under these circumstances would be to apply Pennsylvania law and require a showing of prejudice under these circumstances in this case. And if you do that, obviously, we would have found that part and have asked the court to vacate the second half of the ruling by a judgment vote. Thank you very much. Appreciate it. So I would appreciate it if you would tell me what you think paragraph F means excessively Because paragraph F is a calculation formula. It tells you when the coverage is in place. It is the only place in the contract that tells you what excess of loss means. Or if you go to the next definition, what contributing excess means. It says you wait until the retention is satisfied and then you apply. The coverage comes into place in excess of loss there. In contributing excess proportionately. It does not say, and it does not say that the limit does not apply to expenses. And that's very important from the standpoint of everybody talks about Belafonte. The New York Court of Appeals in excess against factory mutual went further than Belafonte. If you look at that decision, and I have it all here and I was going to read it, but I don't need to do it. I just want to flag two things about that decision. One, it takes the reinsurance accepted is a limit and it is a hard limit. And the whole analysis of the court, and it was a 6 to 1 decision, and I'm going to come back to, I'm going to come back to do with evaluating how much you're going to charge somebody. Sure, absolutely. People pay a lot of attention to expenses, whether that happened there. I can't tell you, but people pay a lot of attention to expenses. Actuaries do calculations of expenses. Who knows what people were considering back then. The New York Court of Appeals has put a firm 100% binding gloss on what reinsurance accepted means. And if you look at the majority decision, it was 6 to 1, and the dissent is also interesting because the dissent reads like they're brief. And 6 to 1, the Court of Appeals rejected that. Every single argument coming down the line. But if you look at the majority opinion, they say, no, we can't do this. No, we can't do that because that would blow the cap. In other words, they are treating the cap as fundamental and that's the New York law. That's really what I have to say about that. So that's what I have to say about that. I have other things I couldn't say but if you don't have any questions. We're saying that's meaning between the lines. I'm saying the rationale between the lines is pretty explicit in the Court's opinion. Yeah, well, I realize that. I'm talking again about the practicalities of this business. The practicalities of this business are that on this issue, it's been 20 years since Bellefonte. It's been 8 years since excess against factory mutual. This comes up, Bellefonte issues come up every single time. They are re-litigating, re-litigating, re-litigating. There's a lot of money involved. It's time to stop. If you're in New York, if you've got New York law, you know the answer. I'm sorry, stare decisis matters because one of the things that happens when you have repetitive litigants is they've got to know what the rule of decision is so they can decide whether to litigate or settle or do whatever. Let's go to Pennsylvania. I'm sorry, go ahead. I was just going to say that could be true under Pennsylvania law, too, though. That stare decisis matter sure does. I'm sorry. I'm just asking if you have a view of what the rule of decision is. Mr. Phillips says that if we would find that New York law applies on a condition precedent question, we vacate and remand for a whole slew of proceedings. No, it's not a whole slew of proceedings. What would happen if we would agree that New York law applies on the only issue it seems to? Look, if we get notice in 2005, that's still four years late. That's not promptly. If they get notice in 2000, the only issue it seems to be as to which there's a possibility of remand, and I suggest to you that there really isn't, is whether the thing that they've talked about about waiver. The facts on a notice came in in April of 2008. It wasn't 100% clear what had happened. It did not include a bill. A bill came in in October of 2009. As soon as the bill came in, we said, whoa, wait a second. We want to audit it. We sent a... The notice was filed, they filed a suit, what, in December, then you kind of claimed in February, right? That's right, but the bill, the thing that they are claiming waiver on is when a bill came in in 2009. We audited it, and we sent a letter before we audited saying we want to audit it. Here are the things we're doing. The cases they cite for waiver are cases where an insurer, none of them are reinsurance cases, an insurer disclaims coverage on some grounds and doesn't include other grounds. The only thing that they can cite to that is, it's in 589 to 591 of the record, the only thing they can cite to that is a letter in which we said we want to audit. We got your bill, we want to audit. Six... Nine days, I think, maybe 11. After we audited, we said, wait a second, condition... We went, we found all of this stuff that was underneath that we hadn't known about for years, and we said, condition proceeding, not satisfied, that's it. I don't... I understand that there's, you know, a momentum when there's an issue of fact or a possible issue of fact that the judge below didn't rule on. I understand there's a momentum to remand. I don't think it's appropriate here because it is so straightforward in the record. The only cases they cite are disclaimer cases. This is not a disclaimer. This is a request to audit. And very promptly after we audited, we found out what the facts were, we disclaimed. Putting aside the fact that by the time we got there, there was no coverage anyway, because when a condition proceeding can no longer be satisfied, the obligation goes away. We had no obligation at that time. The mistake that's in the mistake... I'm going to go back to Mr. Phillips' point that even no matter what you do, it has to go back and remand because you have to decide whether they notified the broker in 2005, albeit 4 1⁄2 years later. It's 4 1⁄2 years later. That's not promptly. And I think it's Union Guard, if I remember correctly, which is five months is too long. There's a lot of laws as to how long is too long. This court's decision in British Insurance, New Jersey Law, said this is too long. I think it was two years later or something like that. There's not really much to speak that four years, 48, forget seven years, even four years is not promptly. And it's in the record and we promptly get out what they knew in 2001 and what they didn't do. Thank you. Thank you very much. Thank you to both counselors for exceptionally well presented argument.